Credit Lyonnais S.A. Credit Lyonnais S.A. Credit Lyonnais S.A. Credit Lyonnais S.A. Credit Lyonnaise S.A. Credit Lyonnaise S.A. Credit Lyonnaise S.A. I might want to devote your attention particularly to ways in which this case might be different from the earlier case. Absolutely, Your Honor. I intend to do that. And let me start by doing just that and contrasting the two. Excuse me. In the prior case, it was the multiple suspicions of terror financing that I just alluded to that posed the jury issue about general awareness for aiding or abetting. Here in contrast, there's no doubt that Credit Lyonnaise reached a sufficient threshold of certainty that its customer CBSP was engaged in unlawful money laundering because that's why they said they closed the account or decided to close it in December of 2001 after filing their second suspicious activity report. There's also no doubt, really no dispute, that they were aware of their role in money laundering because if a bank knows that its customer is money laundering by transfers through its bank account, then the bank knows that its role is the washing machine. So the Credit Lyonnaise argument boils down to the claim that they credibly believe that money laundering has nothing to do with terror financing. The two are completely distinct. And their incredible claim that they were only looking at the sources of CBSP's transfers, not the destinations. And here's the evidence, some of it that I suggest indicates that this is hotly disputed. First of all, they opened the file on CBSP in 1997 because of concern about multiple transfers to Palestine, and I quote, in favor of Islamist associations with no visibility from our end, close quote. That, of course, is the destination that they're concerned with, not the source. And then in their first declaration to the French intelligence unit called TRACFIN, which was in January 15th of 2001, they also reported concerns about their client. TRACFIN actually in its annual report says that it's part of a movement to fight not only terrorists, mainly Islamists, but origins of their financing. So it clearly doesn't distinguish between money laundering and terror financing. Later that same year, on October 30th, after the New York branch of Credit Limits blocked one of the transfers to CBSP, they filed another suspicious activity report with FinCEN. These forms have boxes that you can click off, one of which is for money laundering. They did not check that box. Instead, they wrote in by hand terrorism as the reason for the suspicious activity report. And then just a week later, CBSP's management sent a directive around, which is in the record at 1802 of the appendix, that said that CBSP had to be monitored for, quote, transfers of high amounts or to unusual destinations, close quote. So there's no wonder that the lower court said a jury could find the bank's claim that it was only concerned with the sources and not destinations of the transfers, quote, unquote, incredible. Finally, after that blockage from the New York branch, one month later, they filed a second declaration and then they decided to close the account. They say now it was for money laundering. That was their concern. And they had no concern about terror financing. But clearly FinCEN and TRACFIN, the French intelligence unit, doesn't see a sharp distinction between money laundering and terror financing. And in fact, when CBSP was later designated a specially designated global terrorist by the United States, one of the reasons was that it was part of a web of charities that hide the money trail, money which is then, quote, unquote, diverted or siphoned for terrorism. So obviously hiding the money trail and diverting money into terrorism are closely connected. And that was another reason that the court below in Straus 3, Roman numeral 3, said that concerns about possible international terrorism ties were the reasons for the closing, or at least that there was a genuine dispute on that point. If that's true, then there must be a genuine dispute about whether the bank was generally aware of its role in an unlawful act here, the admitted for purposes of this appeal 2339B violation, which would have the foreseeable consequence of risking terror attacks. You simply can't claim that you know your client is money laundering when all of the regulatory authorities say that terror financing and money laundering work hand in hand, and then say you had no awareness at all of your role in money laundering for terror financing purposes. Moreover, you can't claim and hide behind the notion that all the transfers for charitable purposes, if you know your client, your customer, I should say, is money laundering because ostensibly charitable money laundering is an oxymoron. It's an oxymoron that a jury has to puzzle out. The district court didn't see it that way, but it's impossible to reconcile a holding that, gee, all the money went to charitable purposes, and therefore the transfers are not dangerous, and therefore the bank was not aware of what was doing with the simultaneous finding of a dispute that it knew its client was engaged in money laundering. And only a jury can try to reconcile those two. I think it would be a hard task for it, but it's certainly a jury task. Finally, a suspicion of money laundering also takes the bank's services out of the realm of routine banking. You heard Mr. Blackman use that phrase multiple times in the last argument. It's read throughout both briefs in both cases. They're trying to bring this within some sort of safe harbor that I actually think the Lindy case never created. Lindy said routine banking that violates 2339B doesn't, as a matter of law, equal general awareness of aiding and abetting, not that it never could. Well, when the routine banking is for a customer you know is money laundering, then the banking can't be routine. And again, that creates a genuine dispute for a jury to resolve how you could conceivably engage in money laundering with a suspected designated global terrorist and yet not have any awareness of your role in that activity. Finally, let me turn to the personal jurisdiction argument in this case because the facts are somewhat different here. There were five transfers through New York, not 179, but this court's decision in Leachy-Roman numeral three still stands in the way of the bank's unprecedented but-for argument. In the first place, the distinction between the two cases, Leachy and this one, is not simply in the number of transfers. It's in the fact that the bank used its own branch in New York to make the transfers. And in fact, that confirms a concern, a congressional finding in the Anti-Terrorism and Effective Death Penalty Act, the same act in which they made the finding about how all contributions to foreign terrorist organizations further their terrorist aims. A separate finding they made was that foreign terrorist organizations use the United States as a conduit for funds raised elsewhere. So they had precisely a concern here that the United States was being a conduit and that funds were being raised elsewhere for foreign terrorist organizations. Also, the five transfers were not the only contacts that Credit Unionese had with New York. It received the blocking order that prompted a resuspicion of its customer, CBSP, and led within a month to the closing or the decision to close the account. It received that from its New York branch, and it had seven other communications with the branch as reflected in the appendix at 2327 and 3614. And for that reason, the district court, I think, correctly said that there was a broader operation here fundamentally intertwined with New York. In any case, the standard here is minimum contacts, not predominant contacts. It's whether there's even a single act that is related to the claim that would give the court jurisdiction to consider the entire case. The court, I mean, I'm sorry, the bank cites the Supreme Court decision in Bristol-Myers for the argument that the transfers that occurred elsewhere are not within the jurisdiction of the court. But there's a crucial difference between this case and Bristol-Myers. There, the court was looking at claims by California residents against a drug seller, a drug manufacturer for defective drugs. And it said that while they might give jurisdiction for the residents' claims, all of the conduct giving rise to the non-residents' claims occurred elsewhere. But here, the five transactions all augment the substantial assistance and therefore contributes to the causation of every attack that takes place after the five transfers. They are built into proof of those claims for every subsequent attack. And in that sense, they are related and affiliated with the claims in a way that the Bristol-Myers non-resident claims were not. And I would add that Bristol-Myers does not in any place discuss a causation standard, let alone a But-For causation standard. It simply repeats the affirmation or reaffirms that what's required is an affiliation between the forum and the underlying controversy, principally some activity or occurrence that takes place in the forum state. We have that here. It happened early on, and that activity contributed to the substantial assistance for all the subsequent attacks. Finally, the bank falls back on the argument that, well, these early transfers were innocent, but it has assumed, as did the district court, for purposes of these summary judgment motions, that it violated 2239B, so they're not innocent. And not only that, all occurred after Israel had outlawed the bank's customer as a criminal organization, and four of them occurred after the bank opened a file on CBSP, its customer, and filed its first declaration with TrackFin about Islamist association— Excuse me, you have one more minute. Thank you. —about which they knew little in an area of escalating violence. And so there's nothing innocent about these transfers for purposes of this appeal, at the very least. And then as to reasonableness, I don't think we get there, because as this court said in Leachy, Roman 3, if there are minimum contacts, then a dismissal for unreasonableness would be few and far between. But that's particularly the case here where the forum interest, the U.S. interest in hearing JASTA claims is so strongly expressed. In JASTA itself, Congress made the finding that entities that knowingly or recklessly and directly or indirectly provide material support to foreign terrorist organizations should reasonably anticipate being brought to the United States to answer. And while we don't claim that the congressional finding can resolve the constitutional issue, it certainly expresses a forum interest. And in Burger King, the court said the stronger that kind of forum interest, the lesser showing of minimum contacts would be necessary to support specific jurisdiction. Thank you. Thank you very much. Judge Kears. No questions. Thank you. Judge Jacobs. No questions. Thank you. All right. Mr. Blackman, you're up again. And I'd ask you also to bear in mind we would like to perhaps know how this case differs from the other case. You need not rehearse all of the arguments you made earlier. Mr. Blackman. Have we lost Mr. Blackman? I'm sorry. I was on mute. Forgive me. I'll start again. I won't repeat the legal argument. I think the court understands them. The one point I would make is that what we heard just now was a very eloquent argument for why there's a jury issue for violation of the criminal materials support statute. But nothing that satisfies the elements, additional elements for civil liability under the ATA, including JASTA. As far as the specific factual points made, I'm a little puzzled why my adversary thinks that it is a badge of general awareness of playing a role, the bank playing a role in terrorist activities, that it is faithfully filing suspicious activities reports when it thinks its customer, CBSP, is engaged in money laundering, which involves a suspicion of where the money is coming from and not a suspicion of whether it's in fact being used for charitable purposes, where, again, the record is clear that the internal records of the bank showed that transfers were going to charities and showed that, in fact, CBSP was a legitimate registered charity as it remains to this day in France. A difference is that because of suspicions of money laundering, the bank actually decided to close the account over a year before there was this SDGT OFAC designation. The OFAC designation was on August 21, 2003. The decision to close was made in January 2002. The bank notified CBSP that the account must be closed. There were some bureaucratic hiccups, and so it wasn't. But critically, the last transfer from CBSP account to any of the charities was on February 11, 2002, well before, indeed, as I said, over a year before, a year and a half almost, before the OFAC designation in August 2003. There was this reference to Israeli designations, which go back in time. There is not a shred of evidence in the record that CBSP was aware of those designations. I'm sorry, that Cremlionet was aware of those designations. Cremlionet did not have a branch or any other operations in Israel. I believe there's evidence in the record that shows that Israel does not intend those designations to be extraterritorial any more, frankly, than the OFAC designations are. But in any event, there is no evidence whatsoever that Cremlionet was aware of them. So that is an utter red herring. The fact that there are a tiny, tiny handful of transfers that actually involve dollars going through New York is worth commenting on. In this case, there are exactly five transfers through New York, five, as counsel said, during the entire history of the account, totaling $200,000. I'll say again what I said before, the plaintiff's expert says that Hamas has yearly income of $70 million. So a period of six years, we have $200,000 versus six times $70 million, $420 million. If that's not truly de minimis, it's hard to imagine what is. And that goes to the question of jurisdiction. And it also goes to the question of causation, because how can it seriously be said that those $200,000 are what caused the plaintiff's injuries? This court said in Rothstein that when Congress included the by reason of language in the ATA, that that phrase was repeatedly interpreted by the Supreme Court to require, quote, a showing that the defendant's violation was a but-for and proximate cause of plaintiff's injuries. You said that in 2013 in Rothstein, and you cited Burrage, which is a leading Supreme Court case, that the phrase by reason of requires at least the showing of but-for causation. So you've got a huge causation issue and therefore a huge personal jurisdiction issue here, which just leaps off the page at you. Otherwise, the evidence was undisputed that when Credit Lyonnet was talking about these people, the charities being, quote, Islamists, they weren't referring to terrorism. Mr. O'Dran's deposition testimony was uncontradicted that what he simply meant was Muslim charities, which of course there were. It's really kind of a rewriting of history to suggest otherwise by the plaintiffs. And the reason for these SARs, again, was that there was an increase in donations because there was an increase in need in the occupied territories, but no suspicion whatever that those funds were being used for terrorist purposes or terror financing. Much less that the bank was generally aware that it was playing a role in terrorist activities of any of the charities. There was a reference made to this al-Wafa blocking. That is, with all respect, another total red herring. The branch of Credit Lyonnet in New York, which unlike Credit Lyonnet in France, is of course subject to OFAC regulations, had its filters pick up a transfer to an entity that had the name al-Wafa. It turned out to be a charity in Gaza called al-Wafa, but on the OFAC list at the time was not that charity. And by the way, I should say at the relevant time, this is true of both cases, none of these charities, none was ever designated by OFAC as anything, an FTO, an SDN, an SGDT. But in this particular al-Wafa case, there was a designated entity in Pakistan called al-Wafa, had the same name, which was designated as a supporter of al-Qaeda. So the bank's filter picked up the same name. It turned out to be a false positive. Nonetheless, when the head office in Paris was notified of that, they made a report, but it was a false positive. It was not the al-Wafa in Gaza to which the transfer was actually intended to be submitted. The account was blocked. The transfer rather was blocked. As far as we know, as far as the record shows, it remains blocked to this day. So the fact that the bank got a transfer that turned out to be for someone else, which blocked it, hardly is evidence that the bank was engaging itself in a role in terrorist activity. It's just the opposite. And not to mention that the activity is utterly unrelated to the plaintiff's claims. The fact of the matter is that the plaintiffs, again, are going back to equating material support under a criminal statute with the civil elements. And I think it's revealing that counsel once again cited Holder. Holder is a pre-Lindy case and involves criminal liability. No one is contesting that there is a triable issue found by the district court of material support. Again, there's never been a criminal prosecution by the United States. When Professor Avery Hanson keeps citing legislative history, that was intended in these statutes, including the material support statute, which actually was passed after the Civil Rights Act. The civil liability provisions of the ATA, as we point out in our brief, the civil liability provisions were in 1992. The material support criminal statute was passed in 1996. These were designed to prosecute knowing fundraisers for terrorists. This bank, credibly in a, was never prosecuted under that statute. Neither was NatWest, as I said in the earlier case. And the U.S. government is hardly reticent about bringing prosecutions. One of the things that is kind of interesting about this range of cases that the court has dealt with is that in a number of them, including in Rothstein, if I'm not mistaken, the banks actually violated sanctions and ended up paying fines or entering into DPAs as a result of that. Nonetheless, no civil liability was found because there was a finding that as a matter of law, there was no proximate cause. Well, here is no allegation, nor could there be, or certainly no evidence that the banks ever violated any criminal statute or were ever prosecuted. So what we have is the plaintiffs taking an unprosecuted violation, alleged jury triable issue of a criminal violation and trying to bootstrap it into a civil liability claim by just essentially ignoring all of the elements, and I won't go through them again, of primary liability under 2333A or secondary liability under 2333D. And I could probably go on, but the hour is getting late, and I'll open myself up to questions. Judge Kearse, any questions? No questions. Thank you. Judge Jacobs? No, thank you. I'll pass as well, and we'll turn to plaintiff's counsel. Thank you, Your Honor. Just four quick points, I hope, given the lateness of the hour. First of all, I just wanted to note that the U.S. designation of an SDGT, especially designated global terrorism, has several evidentiary impacts here. Clearly, it can't mean that the defendant knew of the designation before its date, but it also establishes that the designated entity is what the United States says it is at the time it designated, or at least it's evidence of that, and it's historical evidence. The designations are based on past history. They're not predictions. And finally, it also can be used to discredit the bank's repeated claims that if we had only known, we would have done something differently, because after a designation, they do know, and if they give the money back after the designation, then it undercuts their claims of good faith prior to that. Secondly, Mr. Blackman mentioned the Barrage case. I won't repeat what it says, but Barrage, the Paroline case, which they also cite, and the Nassar case in the Supreme Court, all three note that a background tort principle of causation is for multi-caused torts, and it's the principle that where there are multiple causes that independently act with sufficiency to cause the event, then sufficiency and not necessity are but for is the appropriate causation standard. Mr. Blackman spent most of his time discussing how the false positive with Al Wafa had nothing to do with this case, and the very detail he spent on it suggests a dispute in my experience. But in fact, this false positive within a month caused CBSP to be monitored for not only high volume transactions, but transactions to destinations in the Middle East, and shortly thereafter to the closing of the account. So it's impossible to say it has nothing to do with it, whether or not it was a false positive. But in any case, that's hotly disputed. That's just the kind of thing that we ask a jury to resolve on the evidence. And finally, he distinguishes Holder as well as the congressional findings accompanying 2339B as simply constructions of the statute that are not relevant here. That's not right. Excuse me. You have a minute left. Thank you. The Supreme Court expressly said that what it was commenting on and finding an answer to was the empirical question of whether foreign terrorist organizations can separate their terrorism from their non-terrorism. That's an empirical question. And the answer to it is they cannot. And that's an answer that is as applicable here as it is in the 2339B case. Similarly, Congress's findings that entities, foreign terrorist organizations raise money through affiliates, this is what they said in JASTA, the most recent finding, for supporting terrorism, and they raise it outside the United States. Or they're finding at an earlier time that foreign terrorist organizations, all contributions to them further their terrorist events. Those are fact findings. We're not saying that they're binding on the fact finder here, but they're certainly sufficient to create a genuine dispute. They're not limited to some sort of construction of the 2339B statute. Your Honors, I just want to note in closing that this case has now been through four summary judgment motions, and it's time that the disputes that I've identified be submitted to the jury, and we ask that the court reverse and remand for that purpose. Thank you very much. Thank you, sir. And Judge Kearse, any questions? No questions. Thank you. Judge Jacobs? None, thank you. And I have none, so we will reserve decision in both of these cases, the last two cases on the day calendar, and we are adjourned. Thank you very much. Court is adjourned.